James A. Collura, Jr.
State Bar No. 24044502
COATS | ROSE
3 Greenway Plaza, Suite 2000
Houston, Texas 77046-0307
Telephone: (713) 651-0111
Facsimile: (713) 651-0220
jcollura@coatsrose.com

ATTORNEY FOR PLAINTIFF
DON DAVID VALDEN

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 11-40317-rfn-13 |
| DONALD DAVID VALDEN | § | |
|     Debtor. | § | (Chapter 13) |
| | § | |
| DONALD DAVID VALDEN, | § | |
| INDIVIDUALLY AND ON BEHALF OF | § | |
| AMERICAN PIPELINE CONTRUCTION, | § | |
| LLC | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Adversary Number _____ |
| | § | |
| COUNTLESS HOLDINGS, LLC, B & E | § | |
| RESOURCES LTD. CO. AND JIMMY | § | |
| BRANCH | § | |
|     Defendants. | § | |

**ADVERSARY COMPLAINT**

COMES NOW Plaintiff Donald David Valden, individually and on behalf of American Pipeline Construction LLC, and files this Adversary Complaint, and in support thereof, Plaintiff will respectfully show:

## I.   JURISDICTION AND VENUE

1.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

1

2.     This matter is a core proceeding pursuant to 28 U.S.C. §§ 157 (B), (C), (K) and (O) or alternatively, is "related to" the Plaintiff's bankruptcy case under 28 U.S.C. §157(c) (1).

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## II.     PARTIES

4.     DONALD DAVID VALDEN ("Valden" and/or "Plaintiff") is an individual residing in Texas.

5.     AMERICAN PIPELINE CONSTRUCTION, LLC ("APC") is a Texas limited liability company with its principal place of business located in Buna, Texas.

6.     JIMMY BRANCH ("Branch") is an individual residing in Texas. He may be served with process at his residence, 9772 US Hwy 96 South, Buna, TX 77612.

7.     COUNTLESS HOLDINGS, LLC ("Countless Holdings") is a Texas limited liability company. COUNTLESS HOLDINGS, LLC may be served with citation herein by serving its registered agent for service of process, Jennifer E. Branch, P.O. Box 1501, Buna, Texas 77612. Countless Holding's principal place of business is Jasper County, Texas.

8.     B & E RESOURCES, LTD. CO., ("B & E") is a Texas limited liability company. B & E RESOURCES, LTD. CO., may be served with citation herein by serving its registered agent for service of process, Jennifer E. Branch, P.O. Box 1501, Buna, Texas 77612. B & E's principal place of business is Jasper County, Texas.

## III.     FACTUAL BACKGROUND

9.     Plaintiff incorporates paragraphs 1 to 8 as if stated fully herein.

10.     On or about March 16, 2004, B & E Resources, Ltd., Co., was formed. B & E is a company owned by Jennifer Branch, wife of Jimmy Branch. It is managed by Jimmy Branch.

11.     In October 2006, Jimmy Branch formed a company called Falcon Offshore Services, LLC. ("Falcon"). Branch was the sole Member of Falcon listed with the Texas Secretary of State.

2

However Branch was "partners" with Joseph Mills and Joseph Marks. Upon information and belief Branch, Mills and Marks acquired a line of credit for Falcon with personal guarantees. Thereafter Falcon defaulted on its loan, Branch resolved the issue with the lending entity and left his "partners."

12.      On or about March 10, 2008 APC was created and filed with the Texas Secretary of State. Jack Branch was listed as the sole member of APC. It was represented to Valden that Jack Branch was a pseudonym for Jimmy Branch. Upon information and belief Jack Branch is Jimmy Branch's brother. To date and at all times relevant the Texas Secretary of State has listed Jack Branch as the sole member and manager of APC. This Limited Liability Company is governed by a Membership Agreement. See Exhibit "A" (hereinafter "LLC Agreement").

13.      Jimmy Branch formed APC to get involved with the pipeline business.

14.      After forming APC Jimmy Branch approached Plaintiff Valden to enter business as APC. Branch promised to supply his construction knowledge and Valden promised to supply his pipeline experience and industry contacts. Plaintiff Valden's brother, Ted Valdez also agreed to join APC for this endeavor. Jimmy Branch represented to Valden that he would create the limited liability company and the website. In reality the LLC was already formed. Based on these representations and Jimmy Branch's request, Valden forwarded $50,000.00 as an investment in APC.

15.      Branch represented to Valden that he would use B & E on a limited basis to supply tools as needed.  Branch specifically represented to Valden that he would not charge more than Forty Thousand Dollars ($40,000.00) to APC.

16.      Branch also represented to Valden that APC needed funding.  Instead of going through normal lending channels, Branch acquired contacts through Scott Davis. Scott Davis negotiated on behalf of an entity, Mystic Energy, Inc. ("Mystic").

*1611303.1/011527.000001*

3

17.    Branch further represented to Valden that he had acquired funding but required Valden and Valdez to personally guarantee the revolving credit facility with Mystic. Branch also represented that he would be personally guaranteeing the note.

18.    Branch never disclosed to Valden his history with Falcon.

19.    On or about July 1, 2008 Jack Branch sold twenty five percent (25%) of his interest to Ted Valdez and twenty five percent (25%) of his interest to Don Valden.

20.    On the same day, July 1, 2008, Jimmy Branch's wife Jennifer Branch created Countless Holdings. The creation of this entity was not disclosed to Valden.

21.    On the same day, July 1, 2008, Jack Branch sold fifty percent (50%) of his interest to Countless Holdings. Thereafter Jimmy Branch represented to Valden that he was an owner of 50% of APC.

22.    Section 3.08 of the LLC Agreement governs transactions with other entities when a Member (or entity Member in which any of its officers or members has a direct or indirect financial interest) of APC has an interest in the other entity to the transaction. The LLC Agreement states that all transactions or contracts  involving interested members must either be 1) "fair to the company at the time it is authorized, approved or ratified" or 2) "the material facts as to the relationship of each interested party and as to the contract or transaction are known by or disclosed to the other Members, and they nevertheless authorize or ratify the contract or transaction in good faith by an **affirmative vote of the majority of the <u>disinterested</u> Members present**" to be valid. See Exhibit "A," *emphasis added.*

23.    Other than a representation that B & E's involvement would not amount to more than $40,000, no vote of disinterested Members was ever taken.

24.    On July 15, 2008 APC entered into a master service agreement with Trend Gathering & Treating LP ("Trend") for the construction of a pipeline ("Pipeline Project").

25.     Mystic gave APC a line of credit ("Note").  The amount of the line of credit was One and One Half Million Dollars ($1,500,000.00).  APC, as maker of the Note, initially borrowed One Million Dollars ($1,000,000.00) from said line of credit.

26.     On or about July 29, 2008, due to the representations of Jimmy Branch, Valden signed a personal guarantee for the Note.  The other guarantors included Ted L. Valdez, Scott R. Davis, and Jennifer and Jimmy Branch on behalf of Countless Holdings, LLC (collectively referred to herein as "Guarantors").  The Note established that each Guarantor was to be jointly and severally liable in the event of default.

27.     Jimmy Branch was the sole officer and in charge of all aspects of APC's business.

28.     Jimmy Branch along with Don Valden and Ted Valdez opened a bank account for APC with Wells Fargo.  This account was opened in or about July 22, 2008.

29.     Unknown and undisclosed to Don Valden, Jimmy Branch opened a second bank account for APC with Community Bank of Texas.  This account was opened on July 2, 2008.

30.     Through July 2008, B & E deposited $53,139.02 to APC and was paid $3,089.02 by APC.

31.     Through August 2008, APC paid B & E, $124,003.83.

32.     In July and August 2008, APC received in excess of one million dollars from Trend.

33.     On or about August 29, 2008, the Pipeline Project began to fail and Trend stopped paying APC invoices.

34.     Prior to the Pipeline Project falling apart, Mystic was paid approximately $500,000, leaving approximately $500,000 remaining.

35.     Within days of the Pipeline Project falling apart, Jimmy Branch directed APC to pay B & E $785,496.64.  Jimmy Branch similarly directed APC to pay Buna Motor Co. (another entity owned by Jimmy Branch) in excess of $3,721.00.

*1611303.1/ 011527.000001*

36.    After the Pipeline Project failed, and pursuant to the alleged contract between B & E and APC, B & E placed a lien on Trend property claiming it was owed about Five Hundred Eighteen Thousand Dollars ($518,000) by APC for services provided for the Pipeline Project.

37.    In November 2008, Jimmy Branch approached Don Valden and suggested that Scott Davis act as an escrow agent to resolve the deficiency with Mystic.  Branch promised Valden that this escrow arrangement would resolve the difficulties with Mystic. Branch also promised to match the deposits in the scrow account.

38.    On or about November 24, 2008, based upon Jimmy Branch's promises, Don Valden entered into an escrow agreement with Scott Davis whereupon Davis would hold funds in escrow and pay off the Mystic debt.

39.    Don Valden and Ted Valdez each entered into the agreement; however it appears that Jimmy Branch did not.  The first $25,000 went into a personal bank account of Scott Davis, the holding party to the escrow agreement.  Upon this discovery, Don Valden demanded the funds be moved to an actual escrow account, although no explanation was provided by Jimmy Branch as to why the funds were not transferred into an actual escrow account in the first place.  To date, Ted Valdez and Don Valden have contributed $50,000 each to the escrow accounts.  Despite demands and the judgment by Mystic, this money has not been returned to Valden.

40.    On or about December 19, 2008, APC filed a breach of contract action against Trend in Jasper County, which has yet to be resolved.  B & E was named as a Third-Party Defendant for a lien placed on Trend property for money allegedly owed by APC to B & E for the Pipeline Project.  Trend subsequently filed a counterclaim alleging that APC conspired with the Third-Party Defendant, B & E Resources, Ltd. Co., to place a fraudulent lien on Trend.

41.    On or about February 5, 2009, Mystic made demand on APC and each Guarantor under the Note for failure to pay the sums due under the Note.  Subsequently, Mystic chose to

pursue Valden individually, rather than APC or any other Guarantor, for recovery of the principal amount, which was $350,000 plus interest at the time of the filing. The exact reason Mystic failed to pursue APC or other Guarantors is unknown at this time. Upon information and belief, Mystic settled its claims with these individuals.

42.     On or about July 2, 2010, a judgment was entered in the amount of $407,552.80 against Valden. It is unknown at this time 1) what settlements were made with either APC or the other Guarantors; 2) what amounts have been paid to Mystic before and after the judgment against Valden; and 3) what, if any, liens have been placed on APC by Mystic to recover the funds owed on the Note. It is known that settlements have been made, however these settlements include a confidentiality clause which prevents Valden from ascertaining the validity of the judgment against him by Mystic.

43.     Thereafter, Valden filed a voluntary bankruptcy petition with this Court for relief under Chapter 13 of Title 11 of the United States Bankruptcy Code on January 13, 2011.

## IV.     DEMAND FOR BUSINESS RECORDS

44.     Plaintiff incorporates paragraphs 1 to 43 as if stated fully herein.

45.     As a Member of APC, Plaintiff informally requested information about APC's accounts and cash flow to determine where the money was going and what, if any, was available to pay amounts due on the Note. Member Countless Holdings, LLC, by and through its officer Jimmy Branch, did not fulfill this request.

46.     On March 21, 2011, Plaintiff sent a formal demand letter to APC, by and through its registered agent, Jack Branch, to APC attorney, Keith Stanley, and to APC Officer, Jimmy Branch, requesting inspection of certain records and documents Plaintiff is entitled pursuant to TBOC §§ 3.151-53 and 101.501-02 and the LLC Agreement. Attached hereto as Exhibit "B" is the demand

letter of March 21, 2011. TBOC provides that said documents shall be produced within 5 days of demand. To date it has been over forty (40) days without compliance.

47.    On or about April 4, 2011, Plaintiff sent Mystic a letter asking for documents that would clear up any confusion regarding what amount have been paid or are expected to be paid on the amount owed to Mystic pursuant to the Note. Plaintiff requested the documents to determine if the claim against his estate should be reduced. Mystic provided no such documents.

48.    As a result of the aforementioned requests, Plaintiff brings this adversary complaint to enforce its right, as a Member of APC, to know what agreements have been made by and between APC, the Guarantors and/or other Members of APC with Mystic relating to the Note. Such agreements will affect the rights of the estate and establish the validity of claims against the estate.

49.    Jimmy Branch paid B & E large amounts of money for alleged work performed by B & E. Valden was not aware of the nature and extent of the transactions between B & E and APC. Valden did not vote to affirm the transactions with B & E, nor did he authorize or approve any contract between APC and B & E. Valden only learned about the multiple invoices paid by APC to B & E after the Pipeline Project failed. Amounts paid to B & E exceed the amount owed to Mystic.

50.    Plaintiff Valden is entitled to inspect certain documents and records under TBOC § 3.152 in order to determine if there are any counterclaims of the estate, and the validity, extent and priority of liens regarding Mystic's judgment lien.

51.    Plaintiff Valden is entitled to inspect certain documents and records under TBOC § 3.152 to determine what offsets were applied prior to the judgment in favor of Mystic for settlement of APC's Note.

52.    Plaintiff Valden is entitled to inspect certain documents and records under TBOC §
3.152 to determine any amounts subsequently paid to Mystic by APC that would reduce Plaintiff's
judgment lien in favor of Mystic.

53.    Plaintiff Valden is entitled to inspect certain documents and records under TBOC §
3.152 in order to determine if the outcome in the APC/Trend litigation would affect liquidation of
Plaintiff's estate or adjustment of the debtor-creditor.

54.    Plaintiff Valden is entitled to inspect certain documents and records under TBOC §
3.152 to determine the validity and priority of B & E's lien and invoices paid by APC as such will
affect the distribution of funds upon the conclusion of the APC/Trend litigation.

## V.    BREACH OF FIDUCIARY DUTY

### A.    Breach of Fiduciary Duty by Jimmy Branch and Countless Holdings

55.    Plaintiff incorporates paragraphs 1 to 54 as if stated fully herein.

56.    Don Valden, as Member of APC has the right to bring a derivative suit on behalf of
APC for breach of duty of care and breach of duty of loyalty by a Member or officer of APC.

> A derivative suit is the vehicle by which a member may bring an action to remedy or
> prevent a wrong to the LLC. The member would be asserting a cause of action
> belonging to the LLC and thereby acting as the representative and champion of the
> LLC. Examples of claims that would be derivative in nature are breach of the duty
> of care of a member, manager, or officer to the LLC (i.e., mismanagement) and
> breach of the duty of loyalty of such a person to the LLC (i.e., self-dealing,
> appropriation of a business opportunity, etc.).[1]

Although, derivative actions typically mandate a ninety (90) day waiting period after demand is made
on the company to correct such wrong, said demand is not required when irreparable injury to the
limited liability company would result.[2] Given the pending Trend litigation, waiting ninety (90) days

---

[1] 20 Tex. Prac., Business Organizations §20.44 (2d ed.).

[2] Texas Business Organizations Code §101.453.

*1611303.1/011527.000001*

after demand would cause irreparable injury to APC. Thus waiver of the ninety (90) day demand is appropriate.

57.     Plaintiff contends that Jimmy Branch violated his fiduciary duty owed to APC and the other Members of APC by 1) putting B & E's interest above that of APC; 2) authorizing transactions without consent by the Members; and 3) usurping APC funds by placing a lien on Trend property to allow B & E to recover proceeds in the Trend lawsuit before APC.

58.     Jimmy Branch and Countless Holdings, acting as agents for APC, breached fiduciary duties owed to APC.

59.     Section 3.05 of the LLC Agreement states that officers and members of APC shall be agents to APC for the purpose of carrying out APC's business. Countless Holdings, as member of APC, Jimmy Branch, as officer of Countless Holdings and Jimmy Branch as officer of APC are thus agents of APC and as such owe a fiduciary duty to APC and its Members.

60.     The result of the breach of fiduciary duty caused actual and consequential damages to APC. Jimmy Branch continually authorized large sums of money to be paid to B & E for unauthorized work. The deduction of this money substantially reduced the current balance of APC accounts. Consequently, these payments contributed to APC's inability to pay on the Note to Mystic. As such, APC was damaged in the total amounts paid to B & E and continues to be damaged by additional demands for payment of unauthorized services. The amounts claimed are within the jurisdictional limits of this Court.

**B.      B & E is Jointly Liable for Breach of Fiduciary Duty By Jimmy Branch**

61.     Plaintiff incorporates paragraphs 1 to 60 as if stated fully herein.

*1611303.1/ 011527.000001*

62.     In Texas, it is well established that persons who agree with one another to defraud may be held jointly and severally liable as conspirators for the resulting damage.[3] The agreement to defraud does not have to be a formal one and it is not required that each conspirator have full knowledge of the details.[4] The conspiracy can ordinarily be established by circumstantial evidence.[5]

63.     B & E submitted questionable invoices to APC knowing the only party that would see them was Jimmy Branch and B & E's accountant. Jimmy Branch is the party that authorized the work and associated costs. As Jimmy Branch is an agent of B & E, B & E is also jointly liable for Jimmy Branch's breach of fiduciary duty owed to APC.

64.     In the alternative, if the Court finds that B & E is not jointly liable for breach of fiduciary duties, B & E is liable in equity for money had and received. B & E holds money paid by Jimmy Branch that was not authorized by APC. The money paid to B & E belongs to APC as a result of the unauthorized transactions. Therefore B & E holds money to which APC is the rightful owner.

**C.     Rescission of All Contracts Between B & E and APC**

65.     Plaintiff incorporates paragraphs 1 to 64 as if stated fully herein.

66.     To remedy the breach of fiduciary duty by Jimmy Branch, APC is entitled to have any agreement or contract with B & E rescinded that was not authorized by the disinterested Members of APC.

67.     To remedy B & E's joint liability of breach of fiduciary duty by Jimmy Branch, APC is entitled to recover amounts paid out for the unauthorized transactions or in the alternative to recover money had and received by B & E that belongs to Plaintiff APC.

---

[3] *Kirby v. Cruce*, 688 S.W.2d 161, 164 (Tex. App.—Dallas 1985, writ ref'd n.r.e.); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (third party becomes a joint tortfeasor with the fiduciary when the third party knowingly participates in the breach of duty of a fiduciary).

[4] *Kirby*, 688 S.W.2d at 164.

[5] *Id.*

**D.      Fee Forfeiture and Disgorgement**

68.      Plaintiff incorporates paragraphs 1 to 67 as if stated fully herein.

69.      As a result of the breaches of fiduciary duties by Jimmy Branch and Countless Holdings, Plaintiff specifically pleads that the equitable remedies of fee forfeiture and disgorgement are proper.

**E.      Demand for Accounting**

70.      Plaintiff incorporates paragraphs 1 to 69 as if stated fully herein.

71.      Pursuant to Tex. Prop. Code § 113.151 et. seq., Plaintiff demands an accounting by Jimmy Branch and Countless Holdings to account for all transactions by APC.

## VI.      DECLARATORY JUDGMENT

72.      Plaintiff incorporates paragraphs 1 to 71 as if stated fully herein.

73.      A declaration is requested to determine the above-described justiciable controversies concerning the rights and status of the parties.  There is a real and substantial dispute regarding whether B & E has a right to demand payment by APC on unpaid invoices for unauthorized services.  There is also a real and substantial dispute regarding the priority of the distribution of proceeds, which may result from the Trend lawsuit, as to whether said proceeds are first applied to the debt owed by APC to Mystic or to B & E's lien.

74.      Plaintiff also contends that APC has a claim against Jimmy Branch and B & E for amounts paid to B & E on unauthorized transactions.  Finally, Plaintiff contends as a result of Jimmy Branch's breach of fiduciary duty and wasting corporate funds, APC should receive the money over B & E, to either pay off the debt to Mystic or distribute proceeds to the Members to pay the respective guaranties on the Note.

## VII.      FRAUD BY JIMMY BRANCH

75.      Plaintiff incorporates paragraphs 1 to 74 as if stated fully herein.

76.    Jimmy Branch made numerous false representations to Valden as outlined above.  In particular Jimmy Branch:

a.    Failed to disclose that Jimmy Branch had previously defaulted on a loan with his business entity Falcon;

b.    Represented that B & E would only be used on a limited as needed basis for only tools;

c.    Represented that B & E would not charge more than $40,000.00 to APC;

d.    Represented that Jimmy Branch would be personally guaranteeing the loan to Mystic;

e.    Failed to disclose that Countless Holdings and not Jimmy Branch was the owner of 50% of APC;

f.    Represented that there was only one (1) bank account for APC and failed to disclose a second bank account; and

g.    Represented that an escrow arrangement with Scott Davis would resolve the deficiency with Mystic.

77.    All of the foregoing representations were false and/or reckless or should have been disclosed at the time they were made.

78.    Jimmy Branch made the above false representations to Valden with the intent to induce Valden to (a) enter into APC; (b) become a personal guarantor for APC; (c) allow B & E to be used on a limited basis; and (d) enter into an escrow arrangement with Scott Davis.

79.    Valden relied upon Jimmy Branch's representations.  Valden would not have entered into the business relationship with Jimmy Branch if it had been disclosed that Jimmy Branch had previously defaulted on a loan with his prior business venture.

80.     Based on Jimmy Branch's representations, Valden personally guaranteed the Note. Unknown to Valden, Jimmy Branch created a shell business entity with no assets and executed a corporate guarantee.

81.     Based on Jimmy Branch's representations, Valden allowed involvement by B & E. However Jimmy Branch did not limit the cost to about $40,000.00, but approved invoices for work which exceed $500,000.00.  Jimmy Branch had no intention of keeping B & E's involvement with APC to a minimum as is evidenced by all of the work authorized by Jimmy Branch.  As an agent of B & E, Jimmy Branch knowingly invoiced APC for large sums of money and services outside the agreed work.  Jimmy Branch, as agent of APC, approved these invoices knowing they were outside the amounts and scope agreed to by Valden.  Jimmy Branch's actions lead to over half a million dollars being transferred to B & E which caused APC's default on the Note.

82.     Based on Jimmy Branch's representations, Valden entered into a perceived settlement with Mystic through an escrow agent.

83.     As a result, Valden has been damaged by out of pocket expenses in the amount of $50,000.00 to invest in APC, $50,000.00 paid into an escrow account for the Note and by the judgment against him personally in the amount of $405, 602.80, both of which Valden has filed this lawsuit to recover.

84.     Valden also seeks his benefit-of-the-bargain damages in the form of amounts to be ascertained from the Trend litigation without a deduction for the lien of B & E and without participation by Countless Holdings.

85.     The amounts claimed are within the jurisdictional limits of this Court.

## VIII.   NEGLIGENT MISREPRESENTATION BY JIMMY BRANCH

86.     Plaintiff incorporates paragraphs 1 to 85 as if stated fully herein.

87.     Jimmy Branch made numerous false representations to Valden as outlined above.  In particular, Jimmy Branch:

a.      Failed to disclose that Jimmy Branch had previously defaulted on a loan with his business entity Falcon;

b.      Represented that B & E would only be used on a limited as needed basis for only tools;

c.      Represented that B & E would not charge more than $40,000.00 to APC;

d.      Represented that Jimmy Branch would be personally guaranteeing the loan to Mystic;

e.      Failed to disclose that Countless Holdings and not Jimmy Branch was the owner of 50% of APC;

f.      Represented that there was only one (1) bank account for APC and failed to disclose a second bank account; and

g.      Represented that an escrow arrangement with Scott Davis would resolve the deficiency with Mystic.

88.     All of the foregoing representations were made in the course of Jimmy Branch's business or in a transaction in which he had an interest.

89.     All of the foregoing representations were made for the guidance of Valden and Jimmy Branch did not exercise reasonable care or competence in obtaining or communicating the representations.

90.     Don Valden justifiably relied upon these representations to (a) enter into APC; (b) become a personal guarantor for APC; (c) allow B & E to be used on a limited basis; and (d) enter into an escrow arrangement with Scott Davis.

15

91.     Valden relied upon Jimmy Branch's representations.  Valden would not have entered into the business relationship with Jimmy Branch if it had been disclosed that Jimmy Branch had previously defaulted on a loan with his prior business venture.

92.     Based on Jimmy Branch's representations, Valden personally guaranteed the Note. Unknown to Valden, Jimmy Branch created a shell business entity with no assets and executed a corporate guarantee.

93.     Based on Jimmy Branch's representations, Valden allowed involvement by B & E. However, Jimmy Branch did not limit the cost to about $40,000.00, but approved invoices for work which exceeded $500,000.00.  Jimmy Branch had no intention of keeping B & E's involvement with APC to a minimum as is evidenced by all of the work authorized by Jimmy Branch.  As an agent of B & E, Jimmy Branch knowingly invoiced APC for large sums of money and services outside the agreed work.  Jimmy Branch, as agent of APC, approved these invoices knowing they were outside the amounts and scope agreed to by Valden.  Jimmy Branch's actions lead to over half a million dollars being transferred to B & E which caused APC's default on the Note.

94.     Based on Jimmy Branch's representations, Valden entered into a perceived settlement with Mystic through an escrow agent.

95.     As a result, Valden has been damaged by out of pocket expenses in the amount of $50,000.00 to invest in APC, $50,000.00 paid into an escrow account for the Note and by the judgment against him personally in the amount of $405, 602.80, both of which Valden has filed this lawsuit to recover.

96.     The amounts claimed are within the jurisdictional limits of this Court.

## IX.     CIVIL CONSPIRACY BY ALL DEFENDANTS

97.     Plaintiff incorporates paragraphs 1 to 96 as if stated fully herein.

1611303.1/ 011527.000001

98.    Two or more Defendants combined to accomplish an unlawful goal, or to accomplish a lawful goal by unlawful means.

99.    At least one of the Defendants committed an overt act in furtherance of their conspiracy and its goals.

100.    The Defendants combination and actions were undertaken wrongfully, willfully and intentionally.

101.    The Defendant's conduct, as described above amounts to civil conspiracy.

## X.    EXEMPLARY DAMAGES

102.    Plaintiff incorporates paragraphs 1 to 101 as if stated fully herein

103.    Valden further alleges that because Defendant Jimmy Branch knew that the representations described above were false at the time they were made, the representations were fraudulent and constitute conduct for which the law allows the imposition of exemplary damages. In this connection, Valden will show that he has incurred significant expenses, including attorney's fees, in the investigation and prosecution of this action.    Accordingly, Valden requests that exemplary damages be awarded against Defendant Jimmy Branch in a sum within the jurisdictional limits of the court.

## XI.    ATTORNEYS' FEES

104.    Plaintiffs incorporate paragraphs 1 through 103 as if stated herein.

105.    Plaintiff made demand upon Defendants for account and inspection more than 30 days prior to the filing of this suit, see Exhibit "B," and, pursuant to TBOC §3.152(c), Plaintiff is entitled to recover a reasonable amount of attorney's fees.

*1611303.1/ 011527.000001*

## XII.    PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff prays the Court that Defendant be cited to appear and file answer herein, and on final hearing hereof, that the Plaintiff, Don David Valden, recover of and from the Defendant:

a.    A court order allowing Plaintiff Valden to inspect documents and records of APC as provided in TBOC §§ 3.151-52 and 101.501-02;

b.    Rescind any contract between APC and B & E which was not authorized by the disinterested Members of APC;

c.    Award APC actual damages in the amounts paid by Jimmy Branch to B & E out of APC accounts;

d.    Award APC actual damages in the amounts wrongfully received by B & E on behalf of the unauthorized transactions by Jimmy Branch;

e.    Declare that B & E is not entitled to receive any future payments from APC pursuant to unauthorized contracts and invoices.

f.    Declare APC has priority to the proceeds recovered in the trend lawsuit to either pay off debt owed to Mystic or in the alternative distribute said proceeds to the Members to allow them to pay off the respective guaranties;

g.    An award of actual damages as a result of Defendants' fraud;

h.    An award of benefit of the bargain damages as a result of Defendants' fraud or in the alternative an award of out of pocket damages as a result of Defendants' fraud;

i.    An award of out of pocket damages as a result of Defendants' negligent misrepresentation;

j.    An award of exemplary damages as a result of Defendant Jimmy Branch's fraud;

k.    Reasonable attorneys' fees, and all costs of court; and

1611303.1/ 011527.000001

l.        Such other and further relief to which Plaintiffs may show themselves to be justly

entitled.

Respectfully submitted this 5th day of May, 2011

COATS | ROSE

*/s/ James A. Collura*

James A. Collura
State Bar No. 24044502
3 E. Greenway Plaza, Suite 2000
Houston, Texas  77046
Telephone: (713) 651-0111
Facsimile: (713) 651-0220
jcollura@coatsrose.com

ATTORNEY FOR PLAINTIFF
DON DAVID VALDEN

*1611303.1/ 011527.000001*